# Exhibit 2

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

RACHEL TREVINO McCAMY, Independent Administrator
Of the Estate of JULIE MARIE CASTANO-BOAZ, Deceased,

      Plaintiff,

v.                                    File No. 21-006551-NI

STEVEN A. BUFORD, and TYLER G. BOAZ      Hon. Qiana Denise Lillard
ADMINISTRATOR OF THE ESTATE
OF GREGORY D. BOAZ, DECEASED,
MIDWEST AIR TRAFFIC CONTROL SERVICES, INC.,
VITATOE AVIATION, LLC, and
AIRCRAFT INSPECTION & REPAIR, LLC,
      Defendants.

Ellis B. Freatman, III (P34278)
ROBERTS AND FREATMAN
Attorney for The Estate of
Julie Marie Castano-Boaz
125 N. Huron Street
Ypsilanti, Michigan 49197
(734) 483-4166
efreatman@roberts-freatman.com

## AMENDED COMPLAINT & JURY DEMAND

There is another civil action which arises out of the same transaction or occurrence as alleged in this Complaint, pending in this Court. That case is *Boaz v Buford, et al,* Wayne County Circuit Court File No. 21-005170, assigned to the Hon. Dana Margaret Hathaway.



Ellis B. Freatman, III (P34278)

21-006551-NI FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   6/22/2021 4:07 PM   Rita Causey

Plaintiff Rachel Trevino McCamy, Independent Administrator of the Estate of Julie Marie Castano-Boaz, by and through her attorneys, ROBERTS AND FREATMAN says:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Rachel Trevino McCamy is a Texas citizen who is the duly appointed Independent Administrator of the Estate of Julie Marie Castano-Boaz, Deceased ("Castano-Boaz Estate") in Cause No. PR0078919; In the Probate Court of Galveston County, Texas. A Notice of Foreign Administration has been made in Case No. 2021-863882 in the Probate Court of Wayne County, Michigan. Julie Marie Castano-Boaz was married to Gregory D. Boaz and was a passenger on the plane owned and piloted by her husband Gregory D. Boaz that crashed on June 24, 2018. Julie Marie Castano-Boaz was fatally injured in the crash.

2. The pilot and owner of the airplane which crashed, Gregory Boaz, was fatally injured.

3. Defendant Tyler Boaz is a Texas citizen and is the duly appointed Independent Administrator of the Estate of Gregory D. Boaz ("Boaz Estate") in Cause Number PR 0078889, Galveston County, Texas. A Notice of Foreign Administration Filing has been made in Case Number 2021-863891-ML, in Wayne County, Michigan.

4. Defendant Steven A. Buford ("Buford") is a Michigan citizen who was the air traffic controller during the events giving rise to this suit. Defendant Buford may be served at his residence in Detroit, MI, or wherever he may be found.

5. Upon information and belief, Defendant Buford resides in Wayne County, Michigan.

6. Defendant Midwest Air Traffic Control Service, Inc. ("Midwest ATC") is a foreign corporation organized under the laws of the State of Kansas and is authorized to do business in Michigan. Defendant Midwest ATC may be served through its Registered Agent,

National Registered Agents, Inc., 40600 Ann Arbor Road East, Suite 201, Plymouth, MI 48170.

7.  Defendant Vitatoe Aviation L.L.C. ("Vitatoe") is a foreign limited liability company organized under the laws of the State of Ohio that conducts business in, among perhaps other places, Wayne County, Michigan. Vitatoe may be served through its Registered Agent, Larry Vitatoe, at P. O. Box 224, Chillicothe, OH 44601.

8.  Defendant Aircraft Inspection & Repair L.L.C. ("AIR") is a foreign limited liability company organized under the laws of the State of Oklahoma that conducts business in, among perhaps other places, Wayne County, Michigan. AIR may be served through its Registered Agent, Michael T. Frances, at 9818 East 85th Street, Tulsa, OK 74133.

9.  The causes of action alleged in this lawsuit accrued in whole or in significant part in and around the Coleman A. Young Municipal Airport (DET) in Wayne County, Michigan.

10. Venue is proper in this Court pursuant to MCL 600.1629.

11. The amount in controversy in this litigation exceeds the $25,000 jurisdictional minimum of this Court.

12. In addition, the parties are non-diverse, and Defendant Buford is a resident of the forum state.

13. Thus, jurisdiction is proper in this Court.

## STATEMENT OF THE CASE

14. On June 24, 2018, Gregory D. Boaz ("Greg Boaz"), accompanied by his wife, Julie Marie Castano-Boaz, Deceased, and his seventeen-year-old son, Peyton Boaz, departed Baytown Airport (HPY), Baytown, Texas in a Cessna P210N aircraft, registration N3896P ("subject

aircraft," "N3896P," or "aircraft"), flown by Greg Boaz to attend a volleyball tournament in Detroit, Michigan, in which Peyton's sister was participating.

15. After making a refueling stop at West Memphis Municipal Airport (AWM), West Memphis, Arkansas, the group continued their flight into the Detroit area.

16. During the approach into the Detroit area, the approach controllers communicating with Greg Boaz transferred control of the flight to the local tower controller at Coleman A. Young Municipal Airport in Detroit (DET).

17. Defendant Buford was the individual acting as the local or tower controller.

18. Defendant Buford was employed by Midwest ATC.

19. In providing tower control services, Buford was at all relevant times acting in the course and scope of his employment with Midwest ATC.

20. Midwest ATC contracts with the Federal Aviation Administration ("FAA"), among other governmental agencies, to provide air traffic control personnel at tower facilities around the United States.

21. The FAA has delineated the duties and responsibilities for air traffic control personnel, such as Buford and others employed by companies such as Midwest ATC, in FAA Order 7110.65X, which was in effect and applicable at the time of the subject crash.

22. On the date of the crash, Buford and Midwest ATC provided air traffic control services to Greg Boaz from the local control or tower position.

23. At all times, Midwest ATC and Buford were acting independently of FAA controllers in exercising his responsibilities to Greg Boaz as the DET tower controller.

24. There were no FAA controllers present at the DET tower facility and no FAA controllers were involved in the sequence of events once Greg Boaz was communicating exclusively with Buford/Midwest ATC and the DET tower facility.

25. At 19:48:27 Eastern Daylight Time (7:48:27 p.m. EDT), Greg Boaz contacted the DET "City" tower with the current airport and weather information "Lima." Hereafter, all times are EDT beginning at 7:48:27 p.m.

26. At the time of initial contact with the DET tower, the aircraft was flying at 2,000 feet Mean Sea Level ("MSL").

27. There are two runways at DET – Runway 33/15, which runs generally northwest to southeast, and Runway 07/25, which runs generally east to west. The elevations at DET are 625 feet MSL at the threshold of Runway 33, 624 feet MSL at the threshold of Runway 15, and 626 feet MSL at the threshold of Runway 7; the published average field elevation at DET is 626 feet MSL.

28. At 7:48:35, Buford cleared Greg Boaz to land the aircraft on Runway 33 at DET.

29. At that time, the aircraft was flying on a northeasterly course in the direction of DET at 2,000 feet MSL.

30. At 7:49:51, Greg Boaz advised Buford that he had a problem with the aircraft's landing gear as the green landing gear position indicator light in the cockpit was not illuminated, indicating that one or more of the aircraft's three landing gear legs had not lowered properly.

31. Pursuant to FAA Order 7110.65X, this transmission should have indicated to Buford that an emergency situation existed for which emergency personnel and equipment should have been dispatched immediately, however, no emergency personnel or equipment were called.

32. At this time, the aircraft was at 1,500 feet MSL, less than three (3) miles from the threshold of Runway 33 at DET, and in the proper position for a left base turn to the final approach into Runway 33.

33. At 7:50:00, Buford advised Greg Boaz to fly over Runway 33 so the controller could visually inspect the condition of the aircraft's landing gear from his position in the airport control tower, located to the east of Runway 33/15.

34. Greg Boaz turned onto the final approach path to Runway 33 and, at 7:51:23, again advised Buford that he had a "partial down" (i.e., partial extension) but that the green landing gear position indicator light in the cockpit was still not illuminated, indicating that one or more of the landing gear legs were still not properly extended.

35. Between 7:52:10 and 7:52:34, the altitude of N3896P was not recorded by radar while flying over Runway 33 but communications between Greg Boaz and Buford continued.

36. At 7:52:10, Buford advised Greg Boaz that one of his main gear legs appeared to still be in the "up" (i.e., retracted) position.

37. At 7:52:19, Greg Boaz responded that he would "cycle" (i.e., raise and then re-lower) the landing gear again.

38. Despite the gear problem declared by Greg Boaz, Buford continued to handle other aircraft and did not attempt to contact or dispatch airport emergency response personnel or equipment.

39. Additionally, at no point did Buford follow the emergency assistance procedures in FAA Order 7110.65X, such as obtaining the aircraft's remaining fuel load, as required by the emergency assistance checklist.

40. At 7:52:32, Buford cleared another aircraft to take-off from Runway 07.

41. At 7:52:34, N3896P reappeared on radar at 800 feet MSL, tracking over the departure end of Runway 33.

42. At 7:52:45, Greg Boaz confirmed to Buford that he was beginning a left turn.

43. Greg Boaz then began a left traffic "racetrack" pattern climbing to 2,000 feet MSL.

44. At 7:54:45, when the aircraft was at 2,000 feet MSL and in a position to begin another approach towards Runway 33, Greg Boaz asked Buford, "[S]hould we just keep circling here as we work on this gear?"

45. Buford missed this call and asked for the aircraft calling in to "say again please."

46. Beginning at 7:55:00, when Greg Boaz had the aircraft in a position to begin a left base pattern to Runway 33, the following exchange occurred:

| | | |
|---|---|---|
| N3896P | 7:55:00 | "It doesn't appear we're making any progress with the gear whatsoever." |
| Controller | 7:55:05 | "Uh, so uh, what would you like your intentions to be?" |
| N3896P | 7:55:09 | "Well, if we can't make anything happen, I guess we can land in the grass just, uh, on the infield there just parallel with 33, huh?" |
| Controller | 7:55:17 | "Uh…would not prefer that. Um, we got all kinds of lights and stuff in there and I don't want you to land on the grass and then, uh, and damage your aircraft any further or even the airport fixtures. I might have to put you on the east west runway maybe." |
| N3896P | 7:55:40 | "Roger, I see a lot of taxiways on the 7-25 side, buddy." |
| Controller | 7:55:46 | "Yeah, that might be the side we going to have to put you down on." |
| N3896P | 7:55:53 | "So the west side of 15 is not good in the grass?" |
| Controller | 7:55:59 | "I can't clear you for a landing there, but if there's where you have to put it down that would be…uh, |

you think it would be better to land in the grass than on the runway?"

47. Despite his awareness of the landing gear malfunction, Buford refused to authorize Greg Boaz to attempt an emergency landing on the grass infield to the west of Runway 33/15 when N3896P was in a position to execute that approach.

48. By 7:55:59, N3896P was no longer in position to execute an approach into Runway 33 or the grass infield parallel to Runway 33/15.

49. Further, Buford had refused Greg Boaz's request to attempt a landing on the grass infield in the Runway 15 (i.e., southerly) direction.

50. The next exchange occurred beginning at 7:56:24:

| N3896P | 7:56:24 | "You want me on [Runway] 7?" |
|---|---|---|
| Controller | 7:56:26 | "Yeah, um, continue to, uh, enter a downwind for Runway 7 and, uh, cleared to land on Runway 7. I'll see if I can get some equipment out here if you want to just keep circling until I can get some equipment out." |
| N3896P | 7:56:39 | "Well, I just burned out of fuel, we're totally out, bud…" |
| Controller | 7:56:43 | "Okay. Well, I don't want to keep you circling either so, Runway 7, cleared to land." |

51. When Greg Boaz declared the aircraft was out of fuel at 7:56:39, the aircraft was northeast of Runway 15 at an altitude of 1,900 feet MSL or greater and less than one mile to the threshold of Runway 15.

52. At that time, Greg Boaz was in position to "glide" the aircraft to land on Runway 15 or the adjacent grass infield to the west.

53. Buford, aware of the earlier landing gear malfunction and now aware that the pilot just declared the aircraft out of fuel and would, therefore, require an emergency landing,

persisted on having the aircraft land on Runway 7 instead of clearing the disabled aircraft to land on or adjacent to any runway.

54. At that time, Runway 7 was more than 1.8 miles to the southwest of the aircraft's position, while Runway 15 was just off the aircraft's left wing, less than half the distance to Runway 7, and easy for the aircraft to reach without power.

55. Complying with Buford's instructions, Greg Boaz attempted to fly the disabled aircraft towards Runway 7.

56. With no power, N3896P began immediately losing altitude as it attempted to glide towards Runway 7.

57. Although Buford knew that N3896P was in a continuing emergency situation, and despite having the ability to speak to N3896P on the radio and being able to see the aircraft's position, altitude, and heading on his radar screen, at no time after 7:56:43 did Buford attempt to offer any assistance, including but not limited to, an expedited heading, a landing alternative to Runway 7, a landing at the pilot's own risk anywhere on the DET airport, or to call out emergency response personnel or equipment.

58. Even after being told the aircraft had gear problems and then almost seven (7) minutes later ran out of fuel, Buford never followed the procedures delineated in FAA Order 7110.65X for an aircraft in distress, such as inquiring about the aircraft's remaining fuel on board, and never exercised his authority to afford N3896P an expedited opportunity to land the aircraft.

59. The last radar return from N3896P was at 7:57:53 when the aircraft was at 800 feet MSL, less than 180 feet above ground level ("AGL"), and even lower over surrounding buildings and obstructions in the vicinity.

60. At that time, N3896P was 4,486 feet from the threshold of Runway 7.

61. Unable to reach Runway 7, N3896P crashed into a vacant residential lot outside the DET airport area.

62. The aircraft caught fire.

63. Julie Marie Castano-Boaz perished in the post-impact fire, along with Gregory D. Boaz.

64. Peyton Boaz, the son of Greg Boaz and Julie Marie Castano-Boaz, survived the crash with significant injuries.

65. Greg Boaz purchased N3896P in April of 2018.

66. The National Transportation Safety Board ("NTSB") investigated the subject accident and performed an examination on the subject wreckage.

67. The NTSB's Factual Report, which is attached as **Exhibit A** and incorporated into this First Amended Complaint, states that there was no evidence of pre-impact mechanical damage or failure to any of the aircraft's nose and main landing gear actuators – hydraulically-driven devices which assist in extending and retracting the landing gear system – and all three actuators "extended and retracted normally" when tested. However, the NTSB's Factual Report states that:

"[t]he left main gear downlock switch plunger appeared bent and jammed in the closed position, and the plunger did not contact the left gear leg when the gear was fully extended. A continuity check with a multimeter confirmed that the left downlock switch was stuck in the closed position." Further, "[t]he left main gear uplock switch plunger did not contact the left gear leg when the gear was fully retracted." Exhibit A at 7.

68. In the months preceding the accident and Greg Boaz's acquisition of N3896P, Defendants Vitatoe and AIR performed maintenance on the aircraft's landing gear system.

69. During the aircraft's most recent annual inspection dated January 29, 2018, a signed aircraft logbook entry by Vitatoe noted:

"Slight seep noted on left landing gear (seems to be coming from inside brake line), left brake serviced.... Cycled landing gear through 5 fault free cycles, including 1 emergency extension."

70. Less than one month later, in an aircraft logbook entry by Vitatoe dated February 21, 2018, the following maintenance was noted:

"Troubleshoot landing gear problem, found bad diode for gear motor. Replace with 1270717-1 diode. Cleaned and lubed all landing gear switches. Jacked plane and swung [the landing gear] at least 20 times. Landing gear worked perfect every time. All work done IAW Cessna service manual. Released to service."

71. Less than two months before the crash, a signed aircraft logbook entry by AIR dated April 27, 2018 states:

"Removed LH main landing gear leg, removed hydraulic brake fluid transfer fitting, replaced seals, reinstalled gear on aircraft, serviced and bled brakes with 5606 hydraulic fluid, operational, check OK..."

72. Both Vitatoe and A.I.R. returned N3896P, including its landing gear system, to service as airworthy.

73. None of the above-described aircraft logbook entries by both Vitatoe and AIR noted whether the landing gear downlock mechanism, which must be carefully rigged and adjusted each and every time the aircraft's main landing gear legs are removed, was ever properly rigged and adjusted in accordance with the aircraft's service manual.

74. For example, in an aircraft logbook entry by AIR dated December 5, 2011, the following work was noted:

"Removed and replaced all landing gear, flexible hydraulic hoses [. . . ] Adjusted down lock rigging on L/H gear and replaced saddle bumper pad."

75. Further, a different maintenance entity, Tennessee Aircraft Services, Inc., noted the rigging and adjustment of the main landing gear downlock mechanism following maintenance to the landing gear in aircraft logbook entries dated June 13 and 14, 2014.

76. Despite performing maintenance on the aircraft's landing gear in the months before the crash, no record of proper rigging and adjustment of the landing gear downlock mechanism was noted by either Vitatoe or AIR.

77. Thus, either Vitatoe and AIR both failed to properly rig and adjust the aircraft's landing gear downlock mechanism when they performed maintenance on N3896P in the months before the crash, or Vitatoe and AIR both endorsed the aircraft's landing gear as airworthy when, in fact, it was not.

78. On August 11, 2020, the parties participated in a non-destructive inspection of the subject aircraft's wreckage. However, because the landing gear uplock mechanism had been removed from the airframe by the NTSB during its examination, its pre-crash position (i.e., alignment) could not be determined during the inspection.

79. Plaintiff's investigation into this crash continues.

## **COUNT I: NEGLIGENCE OF STEVEN BUFORD**

80. The allegations in preceding paragraphs are adopted and incorporated herein.

81. Defendant Buford is liable to Plaintiff for negligence, which negligence directly and proximately caused the crash and Plaintiff's damages, in the following ways:

   **a.** By failing to comply with published air traffic control standards and procedures, FAA Order 7110.65X, which are specifically designed to prevent this kind of accident;

   **b.** By failing to expedite and maximize assistance and attention to the aircraft after being advised that it was experiencing a landing gear failure;

   **c.** By demonstrating a total lack of concern for the predicament faced by the pilot and the aircraft's occupants;

   **d.** Be demonstrating a complete lack of safety awareness and a failure to give undivided attention to the needs of the aircraft in serious peril, generally and specifically, by continuing to handle other aircraft;

e.  By failing to immediately notify and dispatch airport emergency response personnel and equipment as required;

f.  By failing to obtain critical fuel and occupant information from the pilot after learning of the landing gear failure;

g.  By denying and failing to offer the pilot at least three (3) three different opportunities to land over a period lasting almost seven (7) minutes after learning the aircraft had a landing gear failure;

h.  By failing to authorize the aircraft to land on or adjacent to any runway or area at the DET airport, with the appropriate attendant warning as to off-runway landings;

i.  By sending N3896P to Runway 7 and failing to direct the aircraft to Runway 15, the closest runway to the aircraft's position, when the pilot declared the aircraft was out of fuel.

## COUNT II: NEGLIGENCE OF GREGORY D. BOAZ

82. Defendant Tyler Boaz, as Independent Administrator of the Estate of Gregory D. Boaz, is also liable to Plaintiff for negligence for Defendant Greg Boaz's role in the crash as the pilot of the plane, which was a direct and proximate cause of the crash and Plaintiff's damages.

## COUNT III: NEGLIGENCE OF MIDWEST ATC

83. The allegations in preceding paragraphs are adopted and incorporated herein.

84. Midwest ATC is liable to Plaintiff for its negligence and the negligence of its employees/agents, including but perhaps not limited to Buford, which negligence directly and proximately caused the crash and Plaintiff's damages, in the following ways:

a.  By failing to comply with published air traffic control standards and procedures, FAA Order 7110.65X, which are specifically designed to prevent this kind of accident;

b.  By failing to expedite and maximize assistance and attention to the aircraft after being advised that it was experiencing a landing gear failure;

c.  By demonstrating a total lack of concern for the predicament faced by the pilot and the aircraft's occupants;

d. Be demonstrating a complete lack of safety awareness and a failure to give undivided attention to the needs of the aircraft in serious peril, generally and specifically, by continuing to handle other aircraft;

e. By failing to immediately notify and dispatch airport emergency response personnel and equipment as required;

f. By failing to obtain critical fuel and occupant information from the pilot after learning of the landing gear failure;

g. By denying and failing to offer the pilot at least three (3) three different opportunities to land over a period lasting almost seven (7) minutes after learning the aircraft had a landing gear failure;

h. By failing to authorize the aircraft to land on or adjacent to any runway or area at the DET airport, with the appropriate attendant warning as to off-runway landings;

i. By sending N3896P to Runway 7 and failing to direct the aircraft to Runway 15, the closest runway to the aircraft's position, when the pilot declared the aircraft was out of fuel;

j. By failing to properly train and/or supervise Buford.

## COUNT IV: NEGLIGENCE OF VITATOE AND AIRCRAFT INSPECTION & REPAIR

85. Defendants Vitatoe and AIR are singularly and collectively liable to Plaintiff for negligence, which was a direct and proximate cause of the crash and Plaintiff's damages, in the following ways:

a. By negligently failing to identify and correct deficiencies in N3896P's landing gear system during maintenance and service of the aircraft in the months prior to the crash;

b. For misrepresenting that the aircraft's landing gear were completely and properly repaired and safe for return to service;

c. For making logbook entries attesting to the airworthiness of the aircraft after completion of service when, in fact, the landing gear system was not properly repaired as indicated.

## COUNT V: RES IPSA LOQUITUR

86. Defendant AIR is further liable to the Plaintiff for negligence, under the theory of *res ipsa loquitur*, in the following ways:

   a. The failure of the landing gear system to properly deploy is an event that ordinarily does not occur in the absence of someone's negligence;

   b. The landing gear system, and its relevant components, was in the exclusive control of Defendant AIR when it "removed the [left-hand] landing gear leg" in maintenance performed on April 27, 2018;

   c. Due to its location on the aircraft, Greg Boaz would not have been able to take any action during the accident flight that would have changed the alignment of the landing gear uplock mechanism during flight; and

   d. As the knowledge of the exact nature of the work performed on the landing gear system is in the sole possession of Defendant AIR, evidence of the true explanation of whether the landing gear system was properly rigged and adjusted when the left-hand landing gear leg was reinstalled on the aircraft, is more readily accessible to Defendant AIR than the Plaintiffs.

## DAMAGES

87. Plaintiff seeks all damages recoverable under the applicable law for wrongful death and survival damages, including but not limited to as set forth herein, all of which were directly and proximately caused by the negligence of the parties determined to be responsible for the crash.

## JURY DEMAND

88. Plaintiff hereby requests a trial by jury on all issues in the above-captioned matter.

## CONCLUSION

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, in whatever amount he is found to be entitled, together with costs, attorney fees, interest, and any and all other relief permitted by law.

Dated: June 22, 2021

Ellis B. Freatman, III (P34278)
ROBERTS AND FREATMAN
Attorney for The Estate of
Julie Marie Castano-Boaz
125 N. Huron Street
Ypsilanti, Michigan 49197
(734) 483-4166
efreatman@roberts-freatman.com